UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-198 (JEB) |
| DARIN CARLYLE MOORE, JR., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The Government has charged Darin Carlyle Moore, Jr., Gabriel Brown, John Sweeney, and James Taylor with the abduction and murder of a Maryland man as part of a conspiracy to hold him for ransom. With trial currently set for September, Moore has filed a series of pretrial motions. He seeks to suppress evidence obtained from the seizure of his car, see ECF No. 149 (Moore Mot. to Suppress), to sever his trial from that of his Codefendants, see ECF No. 178 (Moore Mot. to Sever), and to bar admission of purported hearsay and other-crimes evidence. See ECF Nos. 176 (Moore Mot. *in Limine*); 148 (Moore Mot. to Strike). The Government, meanwhile, asks the Court to either require Taylor's telecommunications expert to provide a fuller report or to preclude him from testifying altogether. See ECF No. 161 (Gov't Mot. *in Limine*). The Court will deny all of the Motions with the exception of Moore's Motion to Strike other-crimes evidence, which it grants in part and denies in part.

**I.   Background**

In early 2019, a grand jury returned a five-count superseding indictment, the facts of which, for purposes of this decision, the Court accepts as true. See United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015). On June 19, 2018, the four Defendants kidnapped and held

1

Andre Carlos Simmons, Jr., for ransom before killing him in the early hours of June 20.  See ECF No. 41 (Superseding Indictment) at 2–6.  Efforts to locate and target Simmons and his associates began a month earlier — sometime in May 2018.  Id. at 2–3.  On the evening of June 19, Simmons was abducted in Maryland before being transported to the District in Moore's vehicle.  Id. at 3.  Defendants then demanded money from his family and associates in exchange for Simmons's safe return.  Id. at 4.  After collecting the ransom, they nonetheless took Simmons to an alley elsewhere in the District, where they repeatedly shot him to death.  Id. at 4–6.

From these facts, Defendants are charged with Kidnapping (18 U.S.C. § 1201(a)(1)); Conspiracy to Commit Kidnapping (18 U.S.C. §1201(c)); Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence (18 U.S.C. §924(c)(1)(A)(ii),(iii)); and two counts of First-Degree Murder While Armed (Premeditated and Felony Murder) (D.C. Code §§ 22-2101, 22-4502, 22-2104.01(b)(1) and 22-1805).  Id. at 2–6.

**II.     Legal Analysis**

This Opinion addresses five Motions, which are largely unconnected.  It thus analyzes them separately, setting out the appropriate legal standard in each.

   A.   Motion to Suppress re: Seizure of Nissan Maxima

Moore first moves to suppress evidence obtained from the search of his Nissan Maxima, the car in which Simmons was allegedly taken into the District.  See Moore Mot. to Suppress at 3–4.  In the hours after the murder, the Maxima was towed from the site of Moore's arrest at his girlfriend's residence in Maryland, where it was parked in the driveway, to the District of Columbia Department of Forensic Sciences Lab, where it was subsequently searched.  See ECF No. 1 (Compl.), ¶¶ 10–12.  Although authorities did obtain a warrant before searching the

vehicle, see Moore Mot. to Suppress at 2, there was no warrant at the time of the initial seizure. See Compl., ¶ 12. Moore thus argues that the lack of a warrant bars the seizure and towing of the vehicle. The Court disagrees. In explaining why, it separately discusses the automobile exception to the Fourth Amendment's warrant requirement and the independent-source doctrine.

*1. Automobile Exception*

The "automobile exception" allows for the warrantless search or seizure of a motor vehicle "[i]f a car is readily mobile and probable cause exists to believe it contains contraband." United States v. Maynard, 615 F.3d 544, 567 (D.C. Cir. 2010) (alteration in original) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)); see also United States v. Lawson, 410 F.3d 735, 740 (D.C. Cir. 2005) (considering whether officers had "probable cause to believe [a motor vehicle] contain[ed] contraband or evidence of a crime"); Maryland v. Dyson, 527 U.S. 465, 467 (1999). Authorities "may either conduct an immediate search or remove the vehicle to a police station and search it at some later time." Lawson, 410 F.3d at 741 (citing Chambers v. Maroney, 399 U.S. 42, 52 (1970)).

This exception extends to cars parked in private driveways. See United States v. Goncalves, 642 F.3d 245, 250–51 (1st Cir. 2011) (applying automobile exception to vehicle "parked in a private driveway and unoccupied by anyone who might drive it away"); United States v. Brookins, 345 F.3d 231, 237–38 & n.8 (4th Cir. 2003) (same). Although the automobile exception alone does not justify intrusion onto the curtilage of a home, see Collins v. Virginia, 138 S. Ct. 1663, 1668 (2018), Defendant argues neither that the driveway was curtilage nor that the officers were unlawfully present at the residence to arrest Moore and to execute a search warrant of the home. See Moore Mot. to Suppress.

He similarly does not dispute that authorities had probable cause to believe that there was evidence of the kidnapping-murder in the Maxima. Id. In particular, police observed plastic zip-ties in plain view on the passenger seat of the car (consistent with those used to bind the decedent) as well as damage to the vehicle (consistent with witness accounts of the kidnapping). See ECF No. 110 (Opp. to Mot. to Exclude Statements) at 6; Compl., ¶ 12.

That leaves only the question of whether the car was "readily mobile." It need not be "immediately mobile." California v. Carney, 471 U.S. 386, 391 (1985) ("Even in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception."). A car is "readily mobile" even when parked and inaccessible to a detained suspect. See, e.g., United States v. Williams, 878 F. Supp. 2d 190, 206 (D.D.C. 2012) ("The fact that the car subject to the search . . . was parked and inaccessible to [the] defendant[,] . . . who was already under arrest at the time the search was executed and had turned over the car keys to the police, does not render the automobile exception inapplicable."); Olaniyi v. District of Columbia, 763 F. Supp. 2d 70, 103–04 (D.D.C. 2011) (similar); see also United States v. Young, 371 F. App'x. 358, 361 (4th Cir. 2010) ("The inherent mobility of the car, combined with the lesser expectation of privacy in an automobile as compared to a home or office, justify application of the exception even if the police have control over the automobile at the time of the warrantless search.") (citing United States v. Kelly, 592 F.3d 586, 590–91 (4th Cir. 2010)). As a result, the fact that Moore had been arrested when authorities seized the Maxima does not disable the ready mobility of the vehicle.

While Defendant relies on Coolidge v. New Hampshire, 403 U.S. 443 (1971), to impute an additional exigency-like requirement into the automobile exception, the Supreme Court has rejected that approach. Pennsylvania v. Labron, 518 U.S. 938, 939–40 (1996) (reversing state

court's "incorrect reading" that the automobile exception requires exigent or unforeseen circumstances); see also Dyson, 527 U.S. at 466 (noting that "'automobile exception' has no separate exigency requirement"). The seizure of the Maxima, moreover, would pass muster even under the erroneous test that Moore proposes. Whereas in Coolidge the automobile exception was inapplicable because the suspect "had already had ample opportunity to destroy any evidence he thought incriminating" in the month-plus period since the crime, see 403 U.S. at 460–61, the Maxima was towed within hours of the murder. See Compl., ¶¶ 10–12.

The automobile exception, accordingly, justifies the warrantless seizure of Defendant's vehicle.

### 2. Independent Source

Even if the automobile exception did not apply — and the initial seizure of the Maxima thus violated the Fourth Amendment — the intervening search warrant cures any deficiencies such that the items recovered need not be suppressed.

Generally, fruit of the poisonous tree is subject to the exclusionary rule. See generally United States v. Hood, 435 F. Supp. 3d 1, 6 (D.D.C. 2020) ("When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure.") (quoting United States v. Smith, 373 F. Supp. 3d 223, 236 (D.D.C. 2019)). But "evidence subsequently seized pursuant to a valid search warrant is admissible when 'there was an independent source for the warrant under which that evidence was seized.'" United States v. Glover, 681 F.3d 411, 418 (D.C. Cir. 2012) (quoting Segura v. United States, 468 U.S. 796, 814 (1984)).

In Glover, the D.C. Circuit held that officers' initial warrantless entry into the defendant's house, though unlawful, did not bar evidence from a subsequent search conducted pursuant to a

warrant obtained in the interim. Id. at 418. Critically, officers had an independent basis for the warrant — namely, the smell of illegal narcotics detected before officers ever entered the house — untainted by the illegal activity. Id. Here, evidence was in plain view of the officers — namely, the aforementioned zip-ties on the passenger seat and front-end damage to the Maxima — prior to and independent of the car's being towed to the forensic-sciences lab. In that way, evidence obtained from the search was no more the fruit of the seizure than in Glover. Towing the vehicle yielded nothing beyond the mere preservation of evidence. In sum, because the officers' observations before the towing constituted an independent source for the warrant, the Fourth Amendment does not preclude admission of that evidence — even without application of the automobile exception.

    B. Motion to Sever

Moore next moves to sever his trial from that of his three Codefendants. He believes that Taylor plans to seek an acquittal by pointing out that the evidence against him is weaker than that against the others. See Moore Mot. to Sever at 2. As a result, he posits, Defendants will be working at cross purposes and thus should be severed. This Court has previously denied similar motions by both Taylor and Sweeney, see Feb. 19, 2020, Min. Ord., and Moore's circumstances are no more compelling.

Moore does not contest that all four Defendants were properly joined; he contends only that such joinder is prejudicial to him. See Moore Mot. to Sever; see also Fed. R. Crim. P. 8(b) (permitting joinder of defendants "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses"). Federal Rule of Criminal Procedure 14(a) authorizes district courts to sever otherwise properly joined defendants if joinder "appears to prejudice a defendant or the government." That determination of prejudice

— as well as choice of remedy, if appropriate — is left to the sound discretion of the court.  See Zafiro v. United States, 506 U.S. 534, 538–39 (1993); United States v. Wilson, 605 F.3d 985, 1016 (D.C. Cir. 2010).  When possible, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  Zafiro, 506 U.S. at 539.  And severance is particularly disfavored in conspiracy trials given both the efficacy of trying co-conspirators together and the inequity of inconsistent verdicts.  Id. at 537; United States v. Manner, 887 F.2d 317, 324 (D.C. Cir. 1989) ("In general, we strike a balance in favor of joint trials."); United States v. Ford, 870 F.2d 729, 731 (D.C. Cir. 1989) ("The joinder presumption is especially strong where . . . 'the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia*, with participating in the same illegal acts.'") (quoting United States v. Sutton, 801 F.2d 1346, 1365 (D.C. Cir. 1986)).

Codefendants should be severed "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Wilson, 605 F.3d at 1016 (quoting Zafiro, 506 U.S. at 539).  For example, "when the evidence against one or more defendants is 'far more damaging' than the evidence against another defendant, 'the prejudicial spillover may have deprived a defendant of a fair trial.'"  Id. at 1018 (cleaned up and citations omitted).  Similarly, codefendants may have mutually antagonistic defenses if "the defense one defendant asserts is irreconcilable with that asserted by another defendant."  Id. at 1016.  But, even then, "[m]utually antagonistic defenses are not prejudicial *per se*."  Id. (quoting Zafiro, 506 U.S. at 538).  And the law is "well settled" that severance is not justified simply because defendants "may have a better chance of acquittal in separate trials."  Zafiro, 506 U.S. at 540; see also Wilson, 605 F.3d at 1016 (requiring "more than 'the presence of some hostility' among codefendants, and 'more than the

7

fact that co-defendants whose strategies were generally antagonistic were tried together'") (quoting United States v. Gilliam, 167 F.3d 628, 635 (D.C. Cir. 1999)).

Here, Moore's Motion is largely based on Taylor's February 10, 2021, statements that his defense will "highlight the quantum and character of scientific evidence that the government will seek to admit against Mr. Moore and other defendants and contrast that to the lack of scientific evidence concerning Mr. Taylor." Moore Mot. to Sever at 2. That evidence includes DNA or other biological evidence connecting Moore and the other Defendants (but not Taylor) to the crime. Id. In contrast, Moore may contend that "he did not participate in the offense" by similarly pointing to a comparative lack of other types of evidence — namely, surveillance footage of Codefendants (but not Moore) at a convenience store shortly after the murder as well as biological evidence of Sweeney and Brown in the Maxima registered to Moore. Id. at 4.

These defenses are not mutually antagonistic. This is not a situation where the jury would have to disbelieve evidence presented by Moore in order to credit contrary evidence offered by Taylor or another Codefendant. Instead, just as in many conspiracy trials, the evidence against certain members may be stronger in certain particulars and weaker in others. This in no way translates into one Defendant acting as an additional prosecutor, which itself may not be sufficient to create prejudice. See United States v. Harris, 828 F. App'x. 611, 612–13 (11th Cir. 2020) ("[J]ust having additional defendants sort of serving as a quasi additional prosecutor is not sufficient.").

In fact, the Court has already held — as to Taylor and Sweeney's earlier motions to sever — that no significant disparity in the evidence exists. See Feb. 19, 2020, Min. Ord.; see also Motions Hearing Transcript, Feb. 19, 2020, at 14–15 ("[E]ach defendant . . . has an important role in the conspiracy. And therefore, is not a minimal player."). Moore's position is further

flawed inasmuch as the Government correctly points out that he "fails to cite to any authority in which a court has held that prejudice arises, and therefore severance is warranted, in favor of the defendant against whom the evidence is alleged to be <u>more</u> damaging." ECF No. 181 (Opp. to Mot. to Sever) at 3 (emphasis added and deleted). At the end of the day, joint trial prejudices no Defendant, and the jury remains able to make a reliable judgment of guilt or innocence.

### C. Motion *in Limine* re: Text Messages

Moore next challenges the admissibility of a text conversation between himself and a now-dead associate named Phillip Dumbuya. <u>See</u> Moore Mot. *in Limine*. He argues, first, that the messages are inadmissible as hearsay by a deceased declarant and, second, that they are prejudicial other-crimes evidence barred by Federal Rule of Evidence 404(b). The Court examines each contention in turn.

#### 1. *Hearsay*

The Federal Rules of Evidence generally bar the admission of hearsay, <u>see</u> Fed. R. Evid. 802, defined as an out-of-court statement introduced "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As a preliminary matter, Moore's <u>outgoing</u> messages are not hearsay. Any texts he sent may be admitted into evidence as a party admission. <u>See</u> Fed. R. Evid. 801(d)(2). Although Moore suggests that the text messages stored in his Apple iCloud may not be his own statements, <u>see</u> Moore Mot. *in Limine* at 3, he has presented no evidence to that effect. <u>See</u> ECF No. 179 (Opp. to Moore Mot. *in Limine*) at 2 n.2. Neither the "transient nature of cellphones" nor the "lack of any identifying information in the text messages" *ipso facto* obscures the sender's identity. <u>See</u> Moore Mot. *in Limine* at 3; <u>see also</u> <u>United States v. Lewisbey</u>, 843 F.3d 653, 658 (7th Cir. 2016) (rejecting argument that "the Facebook posts and the text messages taken from two phones . . . should have been excluded on both hearsay and authentication

9

grounds"); United States v. Farley, No. 15-92, 2015 WL 6871920, at *8 (N.D. Cal. Nov. 9, 2015) (rejecting argument that "Government will be unable to prove that it was the Defendant who sent the text messages due to the 'portable nature' of cell phones" because "Defendant does not offer an alternate explanation"). If Moore offers evidence at trial that he did not send the messages, the Court may reconsider this holding.

The principal issue here, therefore, is whether Dumbuya's incoming texts should be excluded. There are a total of thirteen texts over a 24-hour period on May 8-9, 2018. See ECF No. 179-1 (Moore/Dumbuya Text Exchange). First, at Moore's request, Dumbuya sent links to three Instagram accounts of Andre Simmons's associates. These, too, are not hearsay because they are not even statements. A statement is an "oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," Fed. R. Evid. 801(a), not a question, command, greeting, or other "nonassertive" communication where any "conveyed messages . . . were merely incidental and not intentional." United States v. Long, 905 F.2d 1572, 1580 (D.C. Cir. 1990). Photographs are not hearsay. United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980) (explaining that a "photograph is not an assertion, oral, written, or non verbal, as required by Fed. R. Evid. 801(a)"). Much like a photograph, sending a social-media profile is not an assertion. Although the Instagram profiles may have conveyed information — to wit, the identities of potential robbery targets associated with Simmons — they were not intended as an assertion within the meaning of Rule 801(a). To the extent they do constitute assertions — *e.g.*, what the associates look like or where they live — they are not being admitted for their truth.

The remainder of Dumbuya's messages are not hearsay because they are offered for context rather than for their truth. Statements are non-hearsay if they "go to the defendant's intent, motive, or state of mind, help to explain his future conduct, [or] serve to refute any

10

possibility of mistake or misunderstanding." United States v. Safavian, 435 F. Supp. 2d 36, 45–46 (D.D.C. 2006) (finding that many emails received by defendant "are admissible because they might help to explain [defendant's] motive and intent at the time he undertook certain actions" and explaining that, to avoid hearsay, "the contents of those e-mails and the truth of their contents . . . cannot be proven through these e-mails, nor may the government rely on them for that purpose"); see also Lewisbey, 843 F.3d at 658 ("The messages [defendant] received were admitted not for the truth of the matter asserted but instead to provide context for [defendant's] own messages."); United States v. Tolliver, 454 F.3d 660, 666 (7th Cir. 2006) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth."). For example, Dumbuya's 12:24:44 message is offered not to prove that he did not know when his father would give him the car, as stated in the text message, but to "explain why Defendant Moore responds and expresses his desire to conduct surveillance in the area in another vehicle." Opp. to Moore Mot. *in Limine* at 5. The remainder of Dumbuya's messages are similarly offered to explain Moore's intent, motive, and state of mind as reflected by his half of the conversation.

Because the text message string, accordingly, is not hearsay, the Court does not reach the applicability of Rule 801(d)(2)(E), the co-conspirator-statement exception to the hearsay rule.

      2. *Other-Crimes Evidence*

Moore's second argument — that the text messages are inadmissible as other-crimes evidence — is similarly unpersuasive. Federal Rule of Evidence 404(b) bars "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence, however, is admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan,

11

knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); see also United States v. Appiah, No. 19-361, 2020 WL 3469688, at *6 (D.D.C. June 25, 2020) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.") (quoting United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990)). Evidence that withstands 404(b) scrutiny must nonetheless also pass muster under Rule 403's balancing test, but it fails that test only if the risk of "unfair prejudice" "substantially outweighs" any probative value. Appiah, 2020 WL 3469688, at *7.

Moore's 404(b) claim does not get out of the starting gate because the text messages are not "other crimes" or "other acts" evidence within the meaning of that rule. Merely talking about intended surveillance or even intended robberies without more is not a crime. Even if the text conversation were construed as evidence that Moore might engage in other crimes, this Court has already held that evidence of Defendants' efforts to target Simmons and his associates — e.g., two May 2018 home invasions — is relevant as to intent for the charged offenses. See Feb. 19, 2020, Min. Ord. (granting Government's 404(b) motion).

In addition, weighing the probative value against the risk of unfair prejudice does not otherwise bar the text exchange. The risk of unfair prejudice is "minimal" where "other-crimes evidence add[s] no emotional or other pejorative emphasis not already introduced by the evidence of the crime charged in this case." United States v. Straker, 800 F.3d 570, 591 (D.C. Cir. 2015) (citation and internal quotation marks omitted). Here, text messages reflecting conspirators' surveillance efforts are not emotionally charged, particularly as compared to the ultimate abduction and murder. By contrast, the probative value is relatively high. Plans to locate and surveil Simmons's associates implicate the requisite intent for the charged offenses —

12

*viz.*, that Defendants knowingly and willfully kidnapped Simmons. This Motion will thus be denied.

### D. Motion to Strike re: Other-Crimes Evidence

Moore also moves to strike portions of the Government's June 17, 2020, Notice of Supplemental Evidence of Conspiracy. See Moore Mot. to Strike. In other words, he asks the Court to preclude the admission of such evidence. This evidence includes: 1) a May 23, 2018, armed home invasion; 2) text messages concerning unrelated robberies; and 3) communications regarding a firearm. As above, Moore challenges this evidence as prejudicial other-crimes evidence barred by Federal Rule of Evidence 404(b). While the Court agrees that Rule 404(b) precludes evidence of the home invasion, the text messages and photograph are fair game.

#### 1. *May 23 Home Invasion*

On May 23, 2018, Moore, Brown, and Taylor allegedly invaded a home in College Park, Maryland, that was unconnected to Simmons. See ECF No. 145 (Supp. Evid. of Consp.) at 1–4. In the surrounding days (May 21 and 29), there were two other home invasions targeting Simmons and his associates that this Court previously ruled were "intrinsic to the conspiracy" and thus admissible. See Feb. 19, 2020, Min. Ord.; see also Suppl. Evid. of Consp. at 1. Relying on that decision, the Government argues that evidence of this third incident is likewise admissible to show the formation of the conspiracy and relationships among co-conspirators. See ECF No. 154 (Opp. to Mot. to Strike) at 2–6. The Court disagrees.

As explained above, Rule 404(b) prohibits other-crimes evidence from being used to prove a defendant's propensity to commit the charged crime. But if the evidence is "intrinsic" to the charged offense — *i.e.*, "where the incident offered is a part of the conspiracy alleged[—] the evidence is admissible under Rule 404(b) because it is not an 'other' crime." United States v.

Machado-Erazo, 901 F.3d 326, 334 (D.C. Cir. 2018) (quoting United States v. Hemphill, 514 F.3d 1350, 1357 (D.C. Cir. 2008)); but see United States v. Bowie, 232 F.3d 923, 927–29 (D.C. Cir. 2000) (questioning intrinsic-evidence doctrine).  In the context of a conspiracy prosecution, the Government thus has "considerable leeway" to "offer[] evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'"  United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000)); see also Machado-Erazo, 901 F.3d at 334 (tracing conspiracy cases in which D.C. Circuit permitted introduction of "other acts" evidence to "link a defendant to other defendants[,] . . . to show the nature of a conspiracy and the kind of organizational control a defendant exercised, and to show the defendants' intent to act in concert") (citing cases) (internal quotation marks and citations omitted).

That leeway is not without limits.  The D.C. Circuit has "no general 'complete the story' or 'explain the circumstances' exception to Rule 404(b)."  Bowie, 232 F.3d at 929.  Nor has it allowed "evidence that establishes associations or prior relationships" simply "because it may be relevant to show the defendant's knowing participation in a later conspiracy and thus is inextricably intertwined with the facts on trial."  United States v. Sitzmann, 856 F. Supp. 2d 55, 60 (D.D.C. 2012).  In Sitzmann, for example, evidence of the defendant's prior escape from prison with the assistance of future co-conspirators as well as other evidence relevant to establish a cooperative relationship among them was not intrinsic to the instant drug-trafficking conspiracy.  Id. at 58, 60–61.  The strictures of 404(b) still applied.

Here, evidence of the third home invasion is not intrinsic to the conspiracy.  In its February 19 decision, the Court allowed evidence of the two other home invasions in large part

14

because they demonstrated a pattern of attempts to search for Simmons. See Feb. 19, 2020, Min. Ord. In contrast, the College Park incident is unrelated to Simmons and his associates and was motivated instead by efforts to procure money and narcotics. See Supp. Evid. of Consp. at 3. The only plausible justification would be to demonstrate a relationship among our Defendants. As in Sitzmann, however, merely offering evidence to establish associations or prior relationships, without more, is not enough to render that evidence intrinsic. The Government, moreover, has a wealth of other evidence regarding Defendants' relationships with each other.

Nor is it offered for a permitted purpose under 404(b). The Court asks whether "the evidence [is] probative of some material issue other than character" or propensity. United States v. Loza, 764 F. Supp. 2d 55, 57 (D.D.C. 2011) (alteration in original) (quoting United States v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994)). The Government fails to provide such a purpose. The home invasion is a materially different crime from the kidnapping and murder ultimately at issue in this case and, accordingly, largely irrelevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b); see also United States v. Williams, No. 20-121, 2020 WL 7318006, at *5 (D.D.C. Dec. 10, 2020) ("A primary requirement when seeking to establish knowledge or intent with prior bad acts is that the evidence must meet a threshold level of similarity to be admissible."). Instead, such "evidence of other, unrelated bad acts suggest[s] nothing more than a tendency or propensity to engage in criminality." United States v. McGill, 815 F.3d 846, 878 (D.C. Cir. 2016).

Evidence of the College Park home invasion, as a result, is inadmissible under Rule 404(b). The Court, however, may reconsider this ruling if Defendants open the door by making arguments or introducing evidence that would be refuted by this incident.

15

### 2. Text Messages

Applying similar logic, Moore next challenges the admission of text messages between himself and Brown, labeled in the Government's Notice as (i) "Evidence of admissions regarding mistaken/botched robberies" and (ii) "Evidence of intent to commit future robberies." Supp. Evid. of Consp. at 10–16. Here he is unsuccessful. These messages are not in and of themselves bad acts subject to Rule 404(b), nor are they "other crimes" evidence. In any event, they are intrinsic to the conspiracy inasmuch as they demonstrate how Moore and Brown communicated and their intent to act in concert within the relevant timeframe. See Appiah, 2020 WL 3469688, at *8. Unlike the May 23 home invasion, these are repeated points of contact intertwined with the nature of the conspiracy. Rule 403, too, does not bar their admission. While there are references to, in the words of Defendant, "a smorgasboard of alleged criminal conduct" with the "clear implication" that "Moore is a criminal actor who seeks to rob people," Moore Mot. to Strike at 5, such prejudice is outweighed by the substantial probative value. Because the Government does not have access to Defendants' phone calls prior to or during the June 19 abduction, these text messages are critical to demonstrate the nature of the conspiracy. See Opp. to Mot. to Strike at 8. The text messages are thus admissible.

### 3. Communication Regarding Firearm

On June 1, 2018, several weeks before the charged kidnapping and homicide, Moore sent Brown a photograph of a firearm, see ECF No. 145-2 (Moore/Brown Text Exchange) at 34, the admissibility of which he now attacks on 404(b) grounds. According to Moore, such evidence serves only to show his propensity to possess guns. See Moore Mot. to Strike at 6. The Court believes otherwise.

16

At the outset, it is clear that this evidence is not intrinsic to the conspiracy because the firearm is unrelated to the abduction, murder, and home invasions deemed admissible. Id. Assuming the photograph is evidence of a crime — *e.g.*, illegal possession of a firearm — it is thus subject to 404(b). D.C. Circuit law is well established that "[k]nowledge of firearms is a permissible purpose under Rule 404(b)," United States v. Bell, 795 F.3d 88, 99 (D.C. Cir. 2015); Williams, 2020 WL 7318006, at *4 (citing cases), so long as evidence of that knowledge is not stale. United States v. Harris, No. 19-358, 2020 WL 6484311, at *3 (D.D.C. Nov. 4, 2020) (citing United States v. Oral George Thompson, 921 F.3d 263, 269 (D.C. Cir. 2019)). That knowledge, as well as intent and lack of accident, is relevant for the foreseeability of codefendants' use of firearms during an armed offense. See United States v. Fullilove, 471 F. App'x 531, 533–34 (7th Cir. 2012) (discussing foreseeability that co-conspirator would use firearm); see also United States v. Lerma-Plata, 919 F. Supp. 2d 152, 158 (D.D.C. 2013) ("[E]vidence regarding alleged acts and statements by Defendant about the negotiation, purchase, and sale of firearms, would clearly constitute direct evidence of the manner and means used by The Company to carry out the conspiracy during the time period stated in the indictment.").

Here, firearms evidence is offered for just such a permitted purpose. There is some question whether Brown knew that members of the conspiracy would be armed. See Opp. to Mot. to Strike at 7–8. The communication between him and Moore provides evidence of that knowledge, that Moore had access to firearms, and that not just knives would be brought to the gunfight. Turning to the second stage of the analysis, evidence of the firearm is not barred by Rule 403. Such evidence is highly probative of Moore and Brown's joint access to firearms and knowledge that conspirators would be armed. The evidence was not stale; indeed, the

17

communication occurred in the middle of a monthlong conspiracy bookended by home invasions and the ultimate charges. On the other hand, the risk of unfair prejudice is low. The photograph is hardly inflammatory or emotionally charged, and, given the extent of other firearms evidence in this case, unlikely to sway the jury on any improper basis.

### E. Government Motion *in Limine* re: Taylor Phone Expert

Believing that a defense expert's disclosure is insufficient, the Government moves the Court to either require a fuller report or preclude him from testifying. See Fed. R. Crim. P. 16(b)(1)(C) (requiring defense expert to provide written summary of expert testimony intended for use, including witness's "opinions, the bases and reasons for those opinions, and the witness's qualifications"). Taylor has notified the Government that Spencer McInvaille is an expert "on the subjects of telecommunications and cell phone forensics, including the analysis of cellular telephone records and cellular location." Gov't Mot. *in Limine*, Exh. A (March 13, 2020, Letter). He will conclude that "the government's attribution to Mr. Taylor of ownership or possession of the [phone] during the criminal activity . . . is unsupported by the available data, as is the government's equation of that phone's location and usage, during that criminal activity, to Mr. Taylor." Id.

The Government believes that if McInvaille is going to testify that the cell records demonstrate that the phone was somewhere other than where the Government experts have opined, he must offer data and proof. See Gov't Mot. *in Limine* at 4. It appears, however, that McInvaille's testimony will be far more cabined than the Government infers. He will not testify that the phone was in a certain other location; instead, he will attempt only to cast doubt on the Government experts' methodology and analysis. See ECF No. 165 (Taylor Opp. to Gov't Mot. *in Limine*) at 3. The Court, accordingly, will deny the Government's Motion as it appears moot.

Taylor, conversely, will not be able to sandbag the Government at trial by offering McInvaille's opinion that the phone was located somewhere other than where the Government's experts testify.

### III. Conclusion

For the foregoing reasons, the Court will deny the Government's Motion as well as Moore's Motions to Suppress, to Sever, and *in Limine*. As for Moore's Motion to Strike, the Court will grant the Motion as to the May 23 home invasion, deny it as to the text messages, and deny it as to the communication regarding a firearm. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: May 17, 2021