UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 18-198 (JEB) |
| DARIN C. MOORE, JR., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

On November 1, 2022, a jury found Defendants Darin C. Moore, Jr., Gabriel Brown, John Nikea Sweeney, and James Thomas Taylor guilty of two counts arising from the abduction and murder of a Maryland man (kidnapping resulting in death and felony murder). The jury also convicted all but Taylor of two additional counts (conspiracy and first-degree murder). Brown and Taylor now move for a new trial, and Brown also seeks a judgment of acquittal. The Court will deny the Motions.

I.  **Background**

On June 19, 2018, Andre Carlos Simmons, Jr., was kidnapped and held for ransom before being killed in the early hours of June 20. The Government charged all four Defendants with four counts arising from those events: Kidnapping Resulting in Death, in violation of 18 U.S.C. § 1201(a)(1)–(2) (Count I); Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c) (Count II); First-Degree Murder While Armed, in violation of D.C. Code §§ 22-2101, 22-4502, 22-2104.01(b)(1), and 22-1805 (Count III); and Felony Murder While Armed, in violation of D.C. Code §§ 22-2101, 22-4502, 22-2104.01(b)(1), and 22-1805 (Count IV). See ECF No. 41 (Superseding Indictment) at 2–6; see also Minute Entry of Sept. 1, 2022.

1

Trial began on September 19, 2022, and the presentation to the jury lasted nearly six weeks. See Minute Entry of Sept. 19, 2022; Minute Entry of Oct. 20, 2022. The Government's evidence with respect to Brown showed that he helped plan the abduction; participated in a string of phone calls with the other Defendants during the hours Simmons was held; collected ransom money from Simmons's family while on a phone call with other Defendants, who were calling the family and demanding money; and met up with the others afterwards to split the proceeds. See generally ECF No. 354 (Gov't Opposition) at 7–8 (summarizing evidence presented at trial). As to Taylor, the evidence established that his phone communicated with Simmons's family to demand ransom money; he coordinated with the other Defendants to carry out the kidnapping; he participated in transporting Simmons to the location where he was killed; and he also met up with the others afterwards to divide the ransom money. See generally id. (discussing Taylor's involvement); Oct. 19, 2022, Tr. at 64–73 (summarizing evidence of his involvement).

Following deliberations, the jury convicted Moore, Brown, and Sweeney of all four counts; it convicted Taylor of just the first two (kidnapping resulting in death and felony murder). See ECF No. 327 (Verdict Form). Brown has now filed a Motion for Judgment of Acquittal or New Trial; Taylor has also moved for a new trial. See ECF Nos. 338 (Taylor Motion for New Trial); 339 & 341 (Brown Motion for Acquittal or New Trial). The Court decides those Motions together here.

## II.     Legal Standard

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." When considering such a motion, the Court must "consider[] the evidence in the light most favorable to the government" and uphold a guilty

verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir. 2002). Put another way, the Court must determine whether "a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt." United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983).

Federal Rule of Criminal Procedure 33(a), in turn, provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Trial courts enjoy broad discretion in ruling on a motion for a new trial." United States v. Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014). This is true in part because "[t]he rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning." Id. (citation and internal quotation marks omitted). At bottom, the D.C. Circuit counsels that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." Id. (citation and internal quotation marks omitted). This Court nonetheless believes that a clearly erroneous and prejudicial jury instruction could well necessitate a new trial. Cf. United States v. Vicaria, 12 F.3d 195, 198–99 (11th Cir. 1994) (holding that district court did not abuse its discretion in granting new trial after concluding that it had erroneously omitted particular jury instruction); United States v. Adams, 150 F. Supp. 3d 32, 36 (D.D.C. 2015).

**III.    Analysis**

The Court first analyzes Brown's Motions and then turns to Taylor's.

**A.    Brown**

Brown's principal challenge — in seeking a judgment of acquittal or a new trial — is to his conviction on Count I, for kidnapping that resulted in death in violation of 18 U.S.C. § 1201. He offers three prongs of attack.

First, he contends that the Court's jury instruction regarding Count I was deficient and so requires a new trial. See Brown Mot. at 3–4. With respect to this offense, the Court instructed the jury that "there must be a causal relationship between the kidnapping and the death, and the Government must prove beyond a reasonable doubt that, but for the Defendant's actions, Mr. Simmons would not have died." Oct. 19, 2022, Tr. at 5, 25–26. Brown argues that the Court should have additionally instructed the jury that "it must find that Mr. Brown intended that death resulted" — *i.e.*, adding an intent element. See Brown Mot. at 4.

This is not the law. Defendant cites no cases in which courts have required that the Government prove a defendant intended the resultant death under 18 U.S.C. § 1201. Indeed, the Government identifies several cases where courts have held that statutes using such "death results" language do not require a showing of intent. See Gov't Brown Opp. at 5 (citing United States v. Barraza, 576 F.3d 798, 807 (8th Cir. 2009); United States v. Woodlee, 136 F.3d 1399, 1405 (10th Cir. 1998); and other district-court decisions). Defendant points only to cases presenting the general principle that *mens rea* is typically required for each element in a criminal act. See Brown Mot. at 4. But the Government correctly responds that here that principle bows to the more specific notion, articulated by the Supreme Court, that criminal statutes are often designed to ratchet up punishment based on "the unintended consequences of [a defendant's] unlawful acts." Gov't Brown Opp. at 6–7 (quoting and discussing Dean v. United States, 556 U.S. 568, 570–76 (2009)). All told, then, Defendant cites no caselaw for his argument, and his reliance on background statutory principles fails to carry the day.

Second, Brown argues that the Government presented insufficient evidence on this count, thus meriting a judgment of acquittal (or at least a new trial). See Brown Mot. at 4–5. But the Government introduced ample evidence at trial connecting him to the kidnapping that resulted in

4

Simmons's death. This evidence included Brown's communications with Sweeney, Moore, and Taylor before, during, and after the abduction; video and forensic evidence indicating Brown's involvement in retrieving the ransom money; and their meeting up after the murder. See Gov't Brown Opp. at 8 (canvassing evidence). Based on that evidence, a reasonable jury could conclude that Brown actively participated in the kidnapping from which Simmons's death resulted. Given that evidence, moreover, a jury certainly could have convicted Brown on an aiding and abetting theory of liability. To the extent Defendant's argument is that the Government needed to prove that he "participated in the killing" or "knew that a killing would take place," Brown Mot. at 4, the Court reiterates that this is not the standard: as discussed, the Government needed only to prove that Brown participated in the kidnapping that resulted in Simmons's death.

Third, Defendant maintains that there was insufficient evidence that he aided and abetted with respect to the "death resulted" element. Id. at 5. His entire argument is that no evidence showed that the kidnapping was "designed to culminate in death" or that Brown "had any advance notice of such a plan." Id. Again, however, there is no *mens rea* requirement for the resulting-in-death element. Because a principal need not have specific intent that death result under 18 U.S.C. § 1201, an aider and abettor need not either. See United States v. Simpson, 44 F.4th 1093, 1099 (8th Cir. 2022). And there certainly is sufficient evidence that Brown aided and abetted the kidnapping by collecting ransom money while the other Defendants held Simmons and contacted his family. See Gov't Brown Opp. at 8.

Brown briefly raises two cursory arguments for vacating his convictions, both of which fall short as well. He first asserts that the Government's rebuttal closing "improperly attacked the credibility of counsel" and mischaracterized cell-phone and DNA evidence. See Brown Mot.

5

at 5–6. Brown does not identify specific transcript quotations that he finds problematic, nor could he: as the Government's Opposition details, the prosecution engaged in no such attacks and fairly characterized the cell-site, DNA, and text evidence. See Gov't Brown Opp. at 13–15; Oct. 20, 2022, Tr. at 43–44; see also id. at 70 (Court describing why Government DNA argument was proper). Finally, Defendant summarily notes that "[t]he Court erred in denying the motions for mistrial and the evidentiary and instructional requests that Mr. Brown sought pretrial and during trial." Brown Mot. at 6. This assertion identifies no specific errors in any of the Court's rulings and cites nothing for support. The Court accordingly will deny Brown's Motions for a Judgment of Acquittal and for a New Trial.

    B.    Taylor

Taylor raises three grounds for a new trial, which the Court will consider in turn.

    1. *Voice Identification*

His first argument relates to Special Agent Riley Palmertree's identification of Taylor's voice on one of the ransom calls. To understand the nature of his position, a summary of the way in which that evidence came to light is helpful. According to Taylor, the Government made "affirmative representations" in the period leading up to trial that his voice had not been identified on any of the ransom calls. See Taylor Mot., ¶¶ 5–6. He and his counsel would soon learn, however, that this was not the case. Although the Government did not raise the issue on direct, during cross-examination, Taylor's counsel asked Palmertree if he had "recognize[d] Mr. Taylor's voice in the ransom calls," expecting him to respond that he had not. See Oct. 11, 2022, P.M. Tr. at 75. Instead, Palmertree stated that he had indeed heard a voice that "sound[ed]" like Taylor's on one of the calls. Id.

Taylor's counsel were understandably caught off guard by this response. At a recess, counsel complained that they felt they had walked into a sort of trap set by the Government and accused it of "sandbagging to a new level." Oct. 12, 2022, A.M. Tr. at 49. Had they known about this alleged identification, they explained, they would not have asked the agent about it. The Government, for its part, denied any impropriety. It explained that because it had not been planning to elicit that testimony from Palmertree, it had no obligation (and felt no need) to disclose it. Id. at 17. That the evidence came out during cross-examination was thus entirely the fault (or responsibility) of defense counsel's decision to ask an ill-fated question. Id. at 20 (AUSA Wasserman: "Mr. Enzinna is the one who went down this pathway without knowing the answer to the question that he was asking.").

With the stage now set, the Court can turn to Taylor's challenge, which appears to target two forms of alleged Government misconduct: first, its failure to disclose the existence of this critical piece of evidence to the defense; and second, its decision to go one step further and make affirmative misrepresentations about such evidence, which ultimately walked the defense into a trap.

The first allegation is easily dealt with. The parties agree that the prosecution had no intent to use Palmertree's identification as evidence in the trial. As the Government correctly asserts, Taylor does not — indeed, cannot — cite any authority that would require it "to advise the defense of an inculpatory identification that it was not intending to elicit." ECF No. 353 (Gov't Taylor Opp.) at 3. For example, Taylor understandably does not suggest that the identification was exculpatory evidence subject to Brady (it plainly was not) or otherwise subject to disclosure under the Jencks Act, where Palmertree testified that he had never written down his conclusion about the voice anywhere. Id.; Oct. 11, 2022, P.M. Tr. at 76–77. The Government

thus had no independent duty to disclose the identification, and so its failure to do so does not justify granting a new trial.

The Court is more sympathetic, however, to Defendant's second allegation. If Taylor's counsel is correct that the Government affirmatively represented prior to trial that "no one has identified Mr. Taylor's voice on the ransom calls at all," Oct. 12, 2022, A.M. Tr. at 52, one could "certainly see [why] the defense [felt] sandbagged" by Palmertree's revelation. Id. at 53. To be sure, the Government has a partial explanation for its conduct: those representations were made in 2019, years before the trial and before Palmertree had an opportunity to familiarize himself with Taylor's voice and with the ransom calls. Id. at 20–21. It was not until "shortly before the trial" that Palmertree "advised that he recognized Mr. Taylor's voice." Id. at 21. But as this Court asked the Government: "[T]hat representation . . . may have been correct at the time[,] but . . . don't you have the obligation to clarify when you come across newer information?" Id. at 52. The answer — and this Court would agree with Defendant on this — is yes.

Where the Court diverges with Taylor is on the question of whether the Government's conduct justifies a new trial. It does not. To begin, in the context of Palmertree's testimony, the evidence packed little punch. Taylor's counsel spent substantial time on cross-examination successfully impeaching Palmertree's testimony, including by eliciting his admission that he could not remember writing down his identification anywhere or telling anyone about it at the time. See Oct. 11, 2022, P.M. Tr. at 76–77; see also Oct. 12, 2022, A.M. Tr. at 54 ("Mr. Enzinna . . . has certainly raised some potential credibility issues with the jury based on Palmertree's response."); cf. id. at 47 (Government noting that cross-examination was misleading because Taylor's counsel played a call that was not the call on which Taylor was identified, leading jury to think identification was inaccurate).

The Court then took steps to prevent the Government from benefiting from Palmertree's identification. Most significantly, the Government was barred from questioning him about the identification on redirect, despite its insistence that redirect was necessary to restore the agent's credibility. See Oct. 12, 2022, A.M. Tr. at 23, 54–55. In addition, for closings, the Court — in consultation with defense counsel and with their agreement — permitted the Government only to (a) invite the jury to make its own judgment about the identification by comparing a particular ransom call to a recorded jail call between Taylor and another individual; and (b) repeat Palmertree's testimony that the voice he heard "sound[ed] like James Taylor." Oct. 18, 2022, P.M. Tr. at 107–11 (emphasis added). The Government's closing argument stayed within those parameters. See Oct. 19, 2022, Tr. at 109. The Court, moreover, acceded to Taylor's request that his counsel be allowed to argue in closing that "[Palmertree] said he never wrote [his identification] down," despite the Government's protest that it was not permitted to clarify that part of his testimony on redirect. See Oct. 18, 2022, P.M. Tr. at 110–11.

Beyond these prophylactic measures, given the substantial other evidence linking Taylor to the crime, the identification of his voice (even if believed) was merely another brick in the Government's evidentiary wall. See, e.g., Oct. 19, 2022, Tr. at 52–53 (summarizing evidence connecting Taylor to related home invasions); id. at 64–65 (summarizing evidence that ransom phone, which belonged to Taylor, was in Benning Park with abduction car after kidnapping); id. at 77 (evidence that Taylor was with Brown in car used for kidnapping the morning of murder); id. at 81–86 (evidence that Taylor possessed ransom phone at relevant times). Indeed, in its closing, the Government was explicit that the evidence was clearly sufficient for a jury to convict Taylor even without believing that his voice was on any of the ransom calls. Id. at 86 ("While it is entirely possible that James Taylor's voice is one of [the] voices [on the ransom calls], and I

9

encourage you to listen closely to [them], ultimately you need not determine whether his voice is on the ransom calls to determine that he was in possession of this phone at times during the kidnapping and murder and was a participant in the kidnapping over the course of the evening.").

In sum, while the Government's approach to the Palmertree identification may have been problematic, the error it engendered was harmless, particularly given the Court's limiting of the Government's use of the identification.

    2. *DNA Evidence*

Taylor next contends that the Government erroneously argued in its rebuttal closing that the DNA of all four Defendants was found in the kidnapping car (the Maxima), even though that was not true of him. See Taylor Mot., ¶¶ 9–10. It does not help his position that he pinpoints no specific language in that closing to support this argument. Id. In any event, the Court disagrees with his characterization.

The Government was forthcoming throughout the trial about the fact that Taylor's DNA was not found in the Maxima. Consider the following relevant excerpts from the rebuttal. The Government at one point referred to "[t]he presence of DNA of Darin Moore, Gabriel Brown and John Sweeney on multiple items taken from . . . the Maxima," omitting Taylor's name from the list. See Oct. 20, 2022, Tr. at 63. It also acknowledged that "Mr. Taylor's counsel . . . emphasized the DNA and fingerprints results that either excluded him or favored exclusion" and, contrary to Taylor's suggestion, did not deny or dispute those results. Id. at 57. Instead, it encouraged the jury to consider other evidence showing that Taylor was in the Maxima on the night in question, including a video that depicted him getting out of the car at a local convenience store soon after the murder. Id. ("But we know that he was in the Maxima from the Lucky Mart video."). The Government also sought to explain, rather than deny, the lack of

Taylor's DNA and fingerprint evidence in the car. For example, it referred back to the DNA analyst's testimony that "[y]ou don't always leave a [DNA] trace" or "fingerprints of value." Id. at 58.

The transcript of the rebuttal thus confirms the Government's assertion that it "never argued either overtly or impliedly that Taylor's DNA or fingerprints were found on any evidence in the case." Gov't Taylor Opp. at 6. The Court concludes that the DNA issue is not grounds for a new trial.

### 3. *Dumbuya's Involvement*

Finally, Taylor asserts that the Government improperly concealed the existence of a fifth co-conspirator and friend of Moore's, Phillip Dumbuya, until closing argument. See Taylor Mot., ¶ 11. Had Taylor been timely informed of Dumbuya's possible connection to the crime, the Motion continues, he could have fashioned a defense that "the role that the Government alleged was carried out by [him] was, in fact, carried out by Mr. Dumb[u]ya." Id., ¶ 12. The Government counters that "the record is clear that the defendants were on notice of Dumbuya's involvement more than two years before trial." Gov't Taylor Opp. at 9. This is correct.

In June 2020, the Government filed a Supplemental Conspiracy Notice explaining, among other things, that Moore and Dumbuya had communicated about efforts to target Simmons. Id.; ECF No. 145 (Supplemental Conspiracy Notice) at 17–20. The Notice included transcripts of text messages between the two men. See Supp. Notice at 18–20. If that were not enough, Moore filed a Motion *in Limine* to exclude those text messages, see ECF No. 176 (Moore MIL), which the Government opposed in part on the ground that Dumbuya's statements would be "admissible as admissions of a co-conspirator." ECF No. 179 (Opp. to MIL) at 7 (emphasis added). This Court then issued an Opinion on the Motion, which referenced the

11

Government's invocation of the "co-conspirator-statement exception."  ECF No. 189 (Op. on Taylor/Moore Mots.) at 11.

In that context, it is "inconceivable" that Taylor was unaware of Dumbuya's role until closing arguments.  See Gov't Taylor Opp. at 10.  The Court thus concludes that Taylor's third ground for a new trial carries him no farther than the first two.

### IV.   Conclusion

For the foregoing reasons, the Court will deny Brown's Motions for Judgment of Acquittal and for a New Trial and Taylor's Motion for a New Trial.  A separate Order so stating will issue this day.

s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 27, 2023